[No. 2083.  Decided March 21, 1896.]

THE PACIFIC COAST ELEVATOR COMPANY, *Appellant*, v.
B. B. BRAVINDER *et al.*, *Respondents*.

CONSTRUCTION OF CONTRACT OF SALE — PERFORMANCE — BURDEN OF
PROOF — PARTIAL ACCEPTANCE — EVIDENCE — TECHNICAL WORDS —
ADMISSIBILITY OF SAMPLES IN EVIDENCE.

A contract between an elevator company and a wheat dealer
whereby the company " agrees and hereby sells " a certain quantity
of wheat at their warehouse, "all of which is to be delivered and
paid for in thirty days from date of sale, and in case such delivery
is not made [the purchaser] agrees to pay 15c per ton per month
and 10 per cent. interest per annum on such amounts as remain un-
delivered," constitutes an agreement to sell and not a present sale.

In an action to recover the difference between the contract and
the market price of wheat, which the purchaser has refused to accept
on the ground that it was not merchantable as stipulated for by the
contract, the burden of proof is upon the plaintiff to show that it
had offered to deliver the kind of wheat called for by the contract.

Where a contract has been made for the purchase of a quan-
tity of wheat from an elevator company, a partial acceptance, be-
fore the quality of the wheat was discovered, would not show an
acceptance of the whole quantity contracted for, nor an acknowledg-
ment that the balance was of the required quality.

Evidence by farmers who had sold grain to an elevator company,
that their grain was of a good quality, and that so far as they knew
there was very little shriveled wheat in the vicinity, is insufficient
to show the quality of wheat in the warehouse, when large quantities
of wheat had been received into the warehouse of which they knew
nothing, and a large quantity had also been shipped therefrom.

An agreement in a contract for the purchase of wheat to accept
local " weights and grades," does not bind the purchaser to the
grades established by the seller, when there are other wheat ware-
houses in the locality.

In an action to recover upon a contract for the sale of wheat,
which provided that the wheat should be merchantable and was to
be purchased according to local weights and grades, plaintiff cannot
introduce samples of the wheat in evidence when the term "mer-
chantable," as applied to wheat in the locality of the contract, had
a technical meaning, and meant wheat of a quality fit for export
and milling without being mixed with any better grain.

The purchaser of wheat who has agreed to pay 15 cents per ton per month and 10 per cent. per annum interest, on a certain quantity of wheat contracted for which he shall not have taken away by a certain date, cannot be rendered liable therefor when the seller has not offered to deliver the character of wheat contracted for.

Appeal from Superior Court, Spokane County.— Hon. T. J. HUMES, Judge.   Affirmed.

*Graves & Wolf,* ( *W. E. Richardson,* and *S. J. Chadwick,* of counsel), for appellant.

*F. T. Post,* and *A. G. Avery,* for respondents.

The opinion of the court was delivered by

SCOTT, J.—This action was founded upon a claimed breach of the following contract, which was in writing:

"SPOKANE FALLS, WASH.,   
    "December 14, 1891..  }

"The Pacific Coast Elevator Company agrees and hereby sells to Bravinder & Keats, 1,500 bu. wheat sacked now in Alliance Warehouse at Fairfield, Wash., at 85c f. o. b. cars at Fairfield, and 28,000 bus. wheat bulk in their P. C. Co. house at Fairfield at 83c per bu. f. o. b. cars at Fairfield, all of which is to be delivered and paid for in 30 days from date of sale, and in case such delivery is not made Bravinder and Keats agree to pay 15c per ton per month and 10 per cent. interest per annum on such amounts as remain undelivered.

"(Signed)                 PACIFIC COAST EL. CO.   
                        GEO. J. MORTON, Supt.   
                        BRAVINDER & KEATS.

"The above wheat is to be merchantable and Bravinder & Keats agree to accept Fairfield 'weights and grades.'"

It is conceded that the memorandum at the foot was a part of the contract.

Thereafter, the sacked wheat and 8,000 bushels of the bulk wheat were delivered, accepted, and paid for

at various dates in the fore part of the Month of April, 1892.   Later in said month the defendants refused to accept any more of the wheat on the ground that it was of a poor quality and not the kind called for by the contract, whereupon the plaintiff brought this action to recover the difference between the then value of the wheat refused, which was alleged to be 58c per bushel, and the contract price.   At the conclusion of the plaintiff's testimony, the defendants moved the court to direct a verdict in their favor. This motion was in effect granted, although the court directed the jury to bring in a verdict for the plaintiff for 15c per ton per month upon the 8,000 bushels for such time as acceptance was delayed beyond the thirty days from the date of the contract, and ten per cent. per annum interest on the value of said wheat. From the judgment rendered thereon, the plaintiff has appealed.

The questions raised are as to what kind or quality of wheat the contract called for; and whether the burden of proof rested upon the plaintiff to show that the wheat was up to the standard called for, or whether it was incumbent on the defendants to show that it was not; and if the burden was upon the plaintiff, was there sufficient proof to show *prima facie* that the wheat was of the required quality?   In considering these questions, it is first necessary to determine whether the contract showed a sale at the time it was executed or whether it was simply a contract to sell. The plaintiff contends that the operative words in the contract are "hereby sells" and that the same showed a present sale, especially when taken in connection with the provision that delivery and payment were to be made within thirty days from the "date of sale," and further that the provision, "in case such delivery

is not made" the defendants should "pay 15c per ton per month and ten per cent. interest per annum on such amounts as remain undelivered," showed that the defendants accepted the kind of wheat that was in the warehouse. The defendants contend that the contract did not show a present sale, but merely an agreement to sell 28,000 bushels of wheat free on board cars at Fairfield, because said wheat was then stored in the company's warehouse at said place, mixed with a large quantity of other wheat; and furthermore from the fact that it was to be "merchantable" wheat, and it is contended that this word has a local, technical meaning, which we shall further allude to in connection with another branch of the case; and also that it is evident from the contract that it was not intended that all of the wheat should be delivered at one time, but from time to time as desired by the defendants, and that this is evidenced by the clause, "all of which is to be delivered and paid for in thirty days from date of sale, and in case such delivery is not made, Bravinder and Keats agree to pay 15c per ton per month and ten per cent. interest per annum on *such amounts as remain undelivered.*" We are of the opinion that the evident intention of the parties under this contract was not that it constituted a present sale, for the plaintiff was to segregate and weigh or measure the amount agreed to be sold, and was bound to deliver merchantable wheat, and if the wheat stored was not of the quality contracted for in consequence of having shriveled and smutty wheat and other grains mixed with it, as was claimed, it was the duty of the plaintiff to make it merchantable. This being the case, the burden of proof rested upon the plaintiff to show that the balance of the wheat which it claimed it had offered to deliver was of the kind called for by the contract.

Plaintiff also contends that if the contract at the time of its execution did not constitute a present sale, it became a sale at the date on which it was by its terms to be performed. For if it be construed to mean that the plaintiff agreed to sell to the defendants at a future day, and when that day arrived nothing was done in avoidance of the contract, but something was done, to-wit, a partial delivery and payment therefor in pursuance of that contract, it became upon that date a present sale, and therefore that the burden of proof was upon the defendants to show that the wheat was not of the required quality. As to this and the further claim that there was sufficient proof to make out a *prima facie* case that the wheat was of the required quality because said 8,000 bushels from the bulk which was received and paid for, was taken from the warehouse promiscuously by means of elevator buckets running through the mass of the grain stored in the building, and that it was a fair inference that the jury might draw as a matter of fact that the grain thus taken was a fair average of all the grain there stored, it appears that the defendants complained that this 8,000 bushels so received by them was deficient in quality, and not of the kind that they had contracted for, and that they objected to it promptly upon the discovery thereof. Consequently this partial acceptance would not show an acceptance of the whole quantity contracted for, nor an acknowledgment that the balance was of the required quality.

Another contention as to the *prima facie* case is founded upon the testimony of certain farmers who had sold grain to the elevator company that season, and who were more or less acquainted with the grain raised in that vicinity. They testified that their grain was of a good quality, and so far as they knew there

was very little shriveled wheat in that vicinity, and that it was generally free from smut and rust. This testimony was entirely insufficient for the purpose claimed, for large quantities of wheat had been received into the warehouse, during the times covered by the transactions between the plaintiff and the defendants, as to which these witnesses knew little or nothing, and also a great deal had been shipped therefrom, and their testimony was of no value as to that which remained.

The further contention that the contract provided for the acceptance of Fairfield "weights and grades," and that the defendants contracted to accept the grade established by the elevator company, according to which it bought and graded its wheat, as each load of it came in and was deposited in the elevator, and that the grade thus established was binding upon the defendants, is untenable, for it appears that there were two other warehouses or elevators in Fairfield besides the one referred to, and if this clause in the contract meant anything in particular, there was no evidence showing any extraneous facts by which any such meaning could be placed thereon. It could not be held to mean that the grades established by plaintiff at its warehouse should govern. In this same connection it is contended that the warehouse receipts issued by the plaintiff were evidence of the quality of the wheat as the same were given conformably to the provisions of the code, §§ 2,399 and 2,414, inclusive, Gen. Stat. It is a sufficient answer to this to say that the plaintiff did not comply with these provisions, for it appears from the testimony that some of the grain was graded as number one and some of it as number two, and that all of it that came into the elevator was mixed. And furthermore it appears that the wheat delivered

to the plaintiff for which these receipts were issued, was not received by them for storage, but was sold to them by the parties bringing it upon the day of its delivery, and the issuance and cancellation of the warehouse receipts was simply the plaintiff's method of doing its business and keeping an account of its transactions, and was simply putting a grade upon its own wheat.

. It is next contended that the court erred in excluding samples of the wheat offered. The plaintiff claims that the word "merchantable" has a fixed legal meaning, and is used in mercantile contracts for the purpose of denoting the salableness of goods, and that it signifies ordinary quality or medium quality of goodness, salability, etc., and for that reason the jury were competent to judge from the samples as to whether the wheat was of the required quality. The defendants admit that such is the general meaning of the term, but contend that at the locality in question the word had a technical meaning in the wheat trade, and that this was established by the plaintiff's witnesses without any contradiction, and that it meant wheat of a quality that was fit for export or milling without being mixed with any better grain — sound wheat in every respect. This claim is substantiated by the testimony, for it appears that the plaintiff's witnesses did testify that the word "merchantable" had that particular meaning in the wheat trade among dealers on the Pacific Coast, and both the plaintiff and the defendants being dealers in wheat on the Pacific Coast, it will be presumed that the word was used in that sense in which it is commonly used among such dealers. Furthermore, the contract not only uses the word "merchantable" but

also the word "grades," and it is evident that the former referred to the kind of grade and signifies a particular grade of wheat. If the word "merchantable" simply meant an article that could be sold, then the word "grades" is meaningless. Such being the case, the question as to the quality of the wheat was one of skill to be determined by experts and not by an inspection by the jury.

Lastly, it is contended that the plaintiff was entitled to a verdict for 15 cents per ton upon the whole 28,000 bushels, and ten per cent. interest upon the value of all of it, but this position is not well taken, for the contract means that the defendants were to pay 15 cents per ton per month, etc., on such amounts of the wheat which the plaintiff might thereafter deliver according to the terms of the contract, which were not delivered at the suggestion of the defendants within the thirty days provided by the contract. Clearly the contract did not provide for these payments upon any other wheat than that contracted for.

We are of the opinion that no error was committed against appellants in directing a verdict.

Affirmed.

Hoyt, C. J., and Anders, Gordon and Dunbar, JJ., concur.