O. S. ELLIS and C. E. LOFLAND, Administrator of O. S. Ellis, Deceased, Appellant, v. CRICKET COAL COMPANY.

Mines and mining: LEASE: PLEADINGS: CONSTRUCTION. Where a mining lease provided that operations should continue for a certain number of years, or until all minable and merchantable coal had been mined, the defense to an action for royalties that all of the minable and merchantable coal had been exhausted, was a plea that the contract was at an end, and not one of abandonment and release because of no further minable coal.

Same: BURDEN OF PROOF. Under a mining lease requiring an operation of the mine for a specified period, or until all minable and merchantable coal had been exhausted, the burden of proof was on the lessor, when suing to recover royalties, to show that the lease was not terminated by an exhaustion of the minable and merchantable coal.

Same: LEASE: "MERCHANTABLE AND MINABLE COAL." The term "merchantable and minable coal," as used in a lease of property for the purpose of mining coal, upon which the lessee was to pay a royalty to the lessor, contemplates coal that is salable on the market and that can be mined with some profit to the lessee.

Same: EVIDENCE. In determining whether the coal was merchantable and minable at a profit, within the meaning of the lease in question, the jury could take into account the cost of excavating places of refuge along the haulage ways, as is required by statute.

Same: EVIDENCE. Where the parties to a coal mining lease both knew at the time the lease was made that the coal mined could only be sold to a certain railway company, evidence of the price at which it was sold to that company, rather than the market price, was admissible in determining whether it could be mined at a profit.

Same: OPINION EVIDENCE: QUALIFICATION OF WITNESS. Witnesses who knew simply the cost of excavating coal and nothing of the overhead expense were not competent to give an opinion as to whether it could be mined at a profit.

*Appeal from Mahaska District Court.*—HON. HENRY T. SILWOLD, Judge.

WEDNESDAY, SEPTEMBER 30, 1914.

ACTION on contract for minimum royalty on coal not mined resulted in a verdict and judgment for the defendant. The plaintiff appeals.—*Affirmed.*

*W. R. Lacey* and *H. H. Sheriff*, for appellant.

*Burrell & Devitt*, for appellee.

LADD, C. J.—O. S. Ellis purchased the coal beneath the surface of forty-four acres of land, and on February 9, 1906, disposed of the same to the Cricket Coal Company by contract, under the terms of which the latter undertook "to commence mining or paying royalty on said coal on the 1st day of April, 1906, and to prosecute the same with reasonable dispatch, taking into consideration the demands of the trade, excepting also any strikes, lockout, or unavoidable accidents, and to continue such mining of such coal until all the merchantable and minable coal is taken from said land."

The company agreed to pay Ellis "the sum of six and one-fourth cents per ton for all lump coal mined from said land and passing over the regulation screen. In case said mine should be operated upon a mine run basis, then the royalty is to be changed from six and one-fourth cents per ton

for lump coal to four and one-fourth cents per ton for all coal mined from said land on such basis." It also undertook "to mine or pay royalty on not less than an average of one thousand tons each calendar month for six months, beginning April 1, 1906, and for the next succeeding six months not, less than an average of fifteen hundred tons per month, and after April 1, 1907, second party is to mine not less. than an average of seventeen hundred tons per month for each calendar month, and all money paid as royalty, in excess of the sum produced from such mining at six and one-fourth cents per ton for lump coal or four and one-fourth cents per ton for mine run coal, shall be considered as advanced royalty and shall apply on the next or any succeeding month's royalty during the life of this contract."

The company was not required to mine coal from a vein less than three feet and nine inches thick, and the contract continued "for a period of twenty years or until all the merchantable and minable coal in said mine has been exhausted." The company mined coal from the premises until about October 1, 1911, and in this action plaintiff sought to recover the minimum royalty from that time until February 1, 1913, which, if recoverable, would amount to $1,806.25. He alleged "that all the real estate herein described is underlaid with a seam of minable coal that is over three feet nine inches in thickness, and is good merchantable coal, and that all of said coal can be mined by the Cricket Coal Company at a profit."

The defendant denied that there remained any minable coal underlying said land three feet and nine inches in thickness, and averred that, for "a long time prior to the abandonment of the property referred to, the said coal ceased to be minable and merchantable, and that this defendant mined said coal at a financial loss, until it was unable to dispose of the same in the coal market."

Trial resulted in a judgment for the defendant, subsequent to which Ellis departed this life, and the administrator

of the estate left by him was substituted as appellant and is prosecuting this appeal.

Fifty-seven errors are assigned, though but eight of these have been argued, save by way of suggestions in connection with the assignments. The preferable practice is to assign only such errors as are argued, and to print these apart from the brief points and the argument; the latter being in paragraphs corresponding with the assignments. It is enough to say that only those touched in the argument are debatable.

II. The defense was not, as appellant appears to assume, that defendant abandoned the contract and was released therefrom because of the coal not being minable and merchantable, but that, by reason thereof, it terminated. By the express terms of the contract, it was to continue twenty years, or "until all the merchantable and minable coal in said mine has been exhausted," and the company undertook only "to continue such mining of such coal until all the merchantable and minable coal is taken from said land." If, then, all coal of this character had been removed when defendant ceased to work the mine, the contract was at an end, and all liability thereon ceased. As subsequently there was no contract, there could not be a breach thereof, and, as a consequence, no liability for a minimum royalty. The authorities relied on by appellant construe contracts relating solely to the validity of a stipulation to pay a minimum royalty at last, even though a sufficient quantity of coal to equal that amount, at the price fixed, be not removed, and do not consider the effect of a condition that the contract shall terminate with the exhaustion of coal of a specified character. See *Lehigh Co. v. Wright*, 177 Pa. 387 (35 Atl. 921) ; *Timlin v. Brown*, 158 Pa. 606 (28 Atl. 236) ; *Coal Creek Co. v. Tenn. Co.*, 106 Tenn. 651 (62 S. W. 169).

1. MINES AND MINING: lease: pleadings: construction.

Here the limit agreed upon is the exhaustion of the minable and merchantable coal, and this ordinarily should be

regarded equitable between the parties, and certainly has so proven in this instance, for Ellis paid $4,400 for the coal and received more than $6,400 in royalties within five years. As seen, the contract was to continue not longer than the coal was minable and merchantable, and, if that had been removed, was at an end.

III.  The court instructed the jury that the burden of proof was upon plaintiff to prove, by a preponderance of the evidence, that there remained, under the surface of the land

2. SAME: bur-          described, merchantable and minable coal.  To
   den of proof.        this plaintiff takes exception on the theory

that defendant, in pleading that no such coal remained, was setting up a release or discharge from further performance of the contract.  But this is not so.  The defendant did not undertake to mine or pay royalty longer than "until all the merchantable and minable coal is taken from said land," and that event terminated the contract, for it was to "continue for a period of twenty years or until all the merchantable and minable coal in said land has been exhausted."  This was not specified as a condition releasing liability, but as marking the termination of the contract.  The burden was on the plaintiff to prove that the contract was in force and a breach thereof in order to recover, and this could only be done by establishing the fact that all the minable and merchantable coal had not been removed when defendant ceased mining therefrom.  Had defendant relied on some exception or conditional release or discharge, there would be much force to appellant's argument, but, as the continuing existence of the contract and the breach relied on depended on the character of coal, the court did not err in imposing the burden of proof on plaintiff.

IV.  The court instructed that:

The term 'merchantable and minable coal,' as used in these instructions, means coal that can be mined and sold at some profit to the operator, with reasonable expenditure, labor,

and effort, in accordance with the methods approved among practical miners in that territory.

You are instructed that, under the lease or contract in this case, the defendant is required to remove all the coal which is capable of being mined, by the exercise of reasonable skill and effort, but when further mining on the premises cannot be carried on, with reasonable expenditure of money and labor, in accordance with the methods approved among practical miners in that territory, it is no longer required to continue the mining operations, and its obligation to pay royalty ceases when the production of coal becomes either impossible or financially impracticable.

The objection is to the consideration of profit as an element in determining whether the coal is of the character mentioned. The word "merchantable," as here used, evi-

3. SAME: lease: "merchantable and minable coal."

dently has reference to the quality of coal rendering it salable on the market. See *Pacific Coast Elevator Co. v. Bravinder*, 14 Wash. 315 (44 Pac. 544); *Walton v. Black*, 5 Houst. (Del.) 149; *Riggs v. Armstrong*, 23 W. Va. 760, 773. When is coal "minable"? According to the lexicographers, the word means "capable of being mined," but this throws little or no light on the subject, for the inquiry is still open as to what is meant by the definition. The suffix "able" implies ability, fitness, or worthiness, and of course relates to the object designed. Many or few things may be involved in the peculiar quality intended. Thus, as bearing on the minable character of coal, its accessibility, the condition of the earth over it, the interference by water, whether free from or mixed with other substances must be taken into account and where removal as an article of commerce is contemplated, the cost of mining and bringing the coal to the surface is a controlling consideration. The sole object of entering into this contract was to enable defendant to mine the coal in order to dispose of the same at a profit to the Chicago & Northwestern Railroad Company, and possibly others, and, in making use of the expression "merchantable and minable," the parties evidently

intended that the coal to be paid for should be salable on the market, and that it be such as could be mined at a cost such as that defendant could put it on the market at some profit to itself. Otherwise it was not minable, for a miner could not afford to mine it. A mine may not be minable because of the condition of the coal, its distance from transportation, the character of mine, and other circumstances, but these facts are merely explanatory of the real reason (i. e., that the mining cannot be done at a profit), and, by the use of this expression, the parties surely intended that liability for minimum royalty should not attach, unless the coal was salable and could be mined at a reasonable profit. The instructions clearly and forcibly carried this thought to the jury and have our approval.

V. An instruction saying what might be considered in determining whether the coal was merchantable and minable left it open for the jury to take into account the expense of excavating places of refuge along the haulage ways, as required by section 18 of chapter 106 of the Acts of the Thirty-fourth General Assembly. The validity of the provision is not questioned, and, as the expense would have constituted a legitimate part of the cost of mining the coal, it was a matter to be taken into account in ascertaining whether the coal remaining was minable.

4. SAME: evidence.

VI. Evidence was introduced tending to show that the expense of mining the coal, owing to the presence of rocks and other impurities, was $1.91 per ton, and that it was sold to the Chicago & Northwestern Railway Company for $1.80 per ton. Appellant insists that the market price, rather than what the railway company was paying, should have been shown. A sufficient answer is that the location of the mine was such that defendant necessarily depended on the railway company taking the output of the mine, and this was well known to both parties in making the contract. This being so, there was no error in making use of the price paid as the market value.

5. SAME: evidence.

Another objection is that the company's books, from which computation was made, were not produced in court. This was not interposed at the trial, and for this reason ought not to be considered on appeal.

There was no error in ruling that the witnesses Sikes and Lawson were not qualified to express an opinion as to whether coal could be mined at a profit, for each declared he was without knowledge other than of the mere cost of excavating the coal; that is, knew nothing of the overhead charges. The instructions requested, in so far as correct, are included in those given, and the evidence was sufficient to carry the issues to the jury.—*Affirmed.*

6. SAME: opinion evidence: qualification of witness.

WEAVER, EVANS, and PRESTON, JJ., concur.